Plaintiff, as the holder and owner, in good faith, for value before maturity, of a certain promissory note, dated Welch, Louisiana, June 19, 1941, due on November 2, 1941, for the sum of $250, bearing interest at the rate of 8% per annum from maturity until paid, and providing for attorneys' fees at 10% on both principal and interest unpaid, allegedly subscribed and executed by Tansley Miller and Murl Ravia, as makers, and payable to the order of plaintiff, brings this suit against Murl Ravia, one of the alleged makers, to recover said sum with interest and attorneys' fees, with reservation of all his rights against Tansley Miller, the other alleged maker, as well as any lien or privilege against the property given as security by said Tansley Miller for the payment of said note as paraphed thereon.
Defendant denies in his answer that said note was signed by him, either as maker, endorser or otherwise, but alleges that if his signature appears thereon, it is without his knowledge or consent and same should be considered a forgery.
On these issues, the case was tried and resulted in a judgment in favor of defendant and against plaintiff, dismissing plaintiff's suit at his costs. Plaintiff has appealed.
The plaintiff offered in evidence the admitted genuine signature of the defendant as contained on a signature card given by the defendant to the branch bank of the Calcasieu-Marine National Bank of Lake Charles, and which card is dated March 18, 1940, and is signed; "M. Ravia".
Plaintiff then offered the testimony of Mr. Ernest Ellender, manager of the Calcasieu-Marine Nat'l. Bank, at Sulphur, who testified that he has been connected with the bank for a period of about ten years; that he knows the defendant personally, and has seen him sign his name on many occasions; that defendant has an account at his bank and has notes or documents at his bank; that he has had experience in examining and comparing signatures. After identifying the signature card of the defendant, the witness was then asked the following questions and made the following answers, quoting verbatim:
"Q. Now, Mr. Elender, I show you a note introduced in evidence as Exhibit A, ask you to look at the signature which to be that of M. Ravis, and compare it with the signature on the signature card, which has been introduced as Exhibit B, and I would like for you to state your opinion as to whether or not, that is state your opinion as to whether or not the signature on Exhibit A is that of Murl Ravis, from your experience as based on your knowledge of hand writing, by seeing him having written it before, in comparison with those two documents? A. If this had been presented to me I would have accepted it.
"Q. Your opinion is it is the same? A. Its an excellent forgery if it is not the same * * * in other words, I would accept it as being genuine." *Page 296 
Judge Pickrel, the presiding Judge, at this point asked the following question, and elicited the following answer:
"Q. Any doubt in your mind about that? A. No, sir, — I would accept it."
On cross-examination, this witness was asked only the following questions relative to the genuiness of defendant's signature on the note:
"Q. Mr. Elender, you know that there can be some very exact reproductions of signatures, do you not? A. Yes, sir.
"Q. Now, you mean that if this particular signature had been presented you that appears on the note in question in this case and you just saw the note you would have accepted it? A. Yes."
On being called on cross-examination under the Act, the defendant testified that he was in the business of running a market, presumably a meat market, that he knew Tansley Miller, the other purported maker of the questioned note, whose occupation was rice farming; that he had bought some hogs from Miller; and that he had endorsed two notes for Miller, one at the Lake Charles Bank Trust Co., and the other he did not know whether it was at Lake Charles or at the bank at Sulphur.
Plaintiff also offered the testimony of Tansley Miller, the co-maker of the questioned note, an inmate of the Louisiana. State Penitentiary, taken by deposition before a Notary Public. This witness testified on direct interrogatories that he had known the plaintiff for two years and was not related to him; that he has known the defendant for about three years and that they were good friends. He identified the note as representing money he had borrowed from plaintiff, and identified his signature. Relative to defendant's signature he states "The signature of Murl Ravia appears on the note, under my name. It was signed on or about June 19, 1941. There were no other witnesses to either his or my signature. Mr. Murl Ravia had signed other notes for me, one in the sum of $200.00 and another for approximately $50.00 or $65.00, sometime during the year 1940. As Mr. Murl Ravia had signed notes for me on previous occasions, I naturally went to him to get his signature affixed on Note #4222" (the questioned note). He states that he borrowed this money to help him make his rice crop.
In answer to cross-interrogatories, the witness states he has known plaintiff for about two years; has had business dealings with him, such as advances of seed rice; that he sold hogs, chickens and a calf to defendant; that he saw defendant sign the note "immediately after I signed my own name"; that he was convicted of cattle stealing, sentenced to serve one to three years in the penitentiary, and had, at the time of giving his testimony on December 31, 1942, served five months of his sentence.
Plaintiff filed the note sued upon, bearing the alleged signature of the defendant and the alleged co-maker, Tansley Miller.
The defendant, on direct examination and on his behalf, testified that he has had business dealings with Tansley Miller in the buying of hogs both on credit and for cash, and the borrowing of money from Miller and the giving of a note to Miller; that he endorsed two or three notes for Miller (by endorsement, we believe he means that he signed as maker with Miller); that after the payment of the notes by Miller, Miller returned the notes, but in returning one of the notes, his (defendant's) signature had been "torn off at the bottom", Miller explaining that this had been done accidentally, and that this had occurred on about June 19, 1941 (the date of the note). He identified and filed four promissory notes signed by him, on September 4, 1941, August 5, 1942, July 22, 1942, and July 25, 1941, respectively. The note of date July 25, 1941, appears to be a note made and executed by Miller and Ravia. He seeks to explain his possession of this note by stating that he paid the note, and his lack of possession of the other note signed by Miller and himself by stating that Miller had paid that note and only showed it to him with his signature lacking or torn off and the explanation by Miller that his signature had been accidentally torn off. He denies his signature on the note in question and testified that his first knowledge of such a note was by a letter from plaintiff. When that letter was received, what it contained, and his reply thereto are all lacking. He states that he did not know plaintiff nor has he ever had business dealings with him.
Defendant then offered the testimony of Mr. Tom Watson. This witness, after stating that his occupation is banking for twenty years, Assistant Cashier with the Calcasieu-Marine National Bank, and that as such he has witnessed the defendant executing notes in his presence on several *Page 297 
occasions, quoting verbatim from the transcript:
"Q. I hand you note marked Exhibit A, which purports to bear the signature of Murl Revia, ask you whether or not that is Mr. Ravia's signature? A. It looks like it. It has characteristics of his signature. It looks familiar to me.
"Q. That is not the question. The question is whether or not it is his signature? A. I am not thoroughly familiar with his signature to say positively it is his signature.
"The Court:
"Q. Take the notes signed there, the paid notes and see whether or not there is a similarity between those signatures and the one on that note? A. Yes, there is a similarity.
"Q. But there is also dissimilarity in the M. and R? A. Yes, sir.
"Q. The M is written in a different movement, isn't it? A. Some of the M's vary in D-3, and the R. is different also on D-4. The M. on D-1 and the R are a little different.
"Q. M on Exhibit D-2 is different than the signature on the note in question? A. The M. is allright on the signature card. The only difference is in the capital R on the note and the signature card.
"Mr. Stockwell:
"Q. Let me ask you, Mr. Watson, but don't all of these signatures have a similarity to the signature on the note? A. Some similarity, yes.
"Q. Do they not have more similarity than dissimilarity? A. I would say they have more similarity. If this was offered to me as his signature I think I would accept it.
"Q. Is there some dissimilarity on the signatures on these various exhibits that have been introduced here, D-1-2-3 and 4? A. Yes.
"Q. On other words, there is such dissimilarity among these four exhibits as there is in comparison to the note that was introduced in evidence marked Exhibit A? A. Yes.
"Q. And you would be willing to accept the signature on the note Exhibit A as that of Mr. Ravia's? A. If offered to me I am sure I would."
It is true that bank tellers are not experts in handwriting, but they are practical experts, whose duty it is to pass daily upon the genuineness of the signatures of the depositors in the bank, and to protect the funds of the bank against forgeries. One of the two bank tellers who testified in this case was offered by the plaintiff and the other was offered by the defendant. Both of these bank tellers testified that if the note in question had been offered to them, they would have accepted the note as being signed by the defendant. These witnesses do not appear to be biased or prejudiced nor to have any interest in the case. To the contrary, it appears that Mr. Ellender is the manager of the bank where defendant does his banking business, and that Mr. Watson is an assistant cashier of the parent bank with which the defendant has had business transactions. If anything, they should have been friendly towards defendant; at least, he must have thought so in the case of Mr. Watson, since he called him as his witness.
As the record stands, we have the direct testimony of Miller that he was present and saw the defendant sign the note. As against this, we have the testimony of defendant denying his signature. It was urged in oral argument that the testimony of Miller should not be believed for the reason that he was a self-confessed cattle thief and serving a term in the penitentiary and furthermore that he had an interest in the case in sustaining the note in that if otherwise, he could be prosecuted for forgery. Likewise, it can be said that defendant has an interest in the final outcome of the case. If he is not successful, he stands to lose $250, with interest and costs of which he has had no enjoyment.
Article 325 of the Code of Practice provides that "If the defendant deny his signature, * * * or contend that the same has been counterfeited, the plaintiff must prove the genuineness of such signature, either by witnesses who have seen the defendant sign the act, or who declare that they know it to be his signature, because they have frequently seen him write and sign his name".
Article 2245 of the Civil Code provides that "If the party disavow the signature, * * * it must be proved by witnesses or comparison, as in other cases."
This rule of proof by comparison has been complied with in the present case in the testimony of Messrs. Ellender and Watson, to say nothing of the testimony of Miller. *Page 298 
We have also compared the signatures to the note sued upon with that of defendant to the bank card and with the admitted signatures on the other notes marked "D-1", "D-2", "D-3", and "D-4", and we are, like Mr. Watson, defendant's witness, impressed with the similarity of all these signatures. It is proper to examine and compare the denied signature with the other admitted signatures of the alleged signer, which was offered in evidence. Teutonia Bank v. Heaslip, 138 La. 860, 70 So. 861.
It is our conclusion that plaintiff has proved his case to a legal certainty, and it is therefore ordered, adjudged and decreed that the judgment appealed from be annulled and set aside, and it is now ordered that there be judgment in favor of plaintiff E.F. Hardcastle, against defendant, M. Ravia, in the sum of $250, together with interest after Nov. 2, 1941, at the rate of 8% per annum until paid, and 10 per cent. on both principal and interest as attorneys' fees, and all costs of suit. The plaintiff's right of action against Miller, the other maker of the note, is reserved, as well as any lien or privilege against the property given as security by said Miller for the payment of said note as paraphed thereon.