McBRIDE, Judge.
Mirandona Brothers, a commercial co-partnership, brought this suit against Lorice Danos for $760.50, the alleged amount due on two notes respectively for $150 and $450, and for the balance of $160.50 due on an open account. The defendant filed a general denial. The matter comes before us on the appeal of plaintiff from a judgment dismissing the suit after a trial on the merits of the case.
Danos, during the 1946-1947 trapping season, together with his brother, Oristide Danos, trapped fur-bearing animals on a tract of land owned or controlled by plaintiff in the Parish of Plaquemines.
Plaintiff, domiciled in New Orleans, is in the raw fur business. During the 1946-1947 season, Lorice and Oristide Danos “worked” for Mirandona Brothers, who “bought” ■ from them 2,506 muskrat skins and four mink skins. We gather from the record that prior to, during, and after trapping seasons plaintiff makes cash advances to its trappers, as well as furnishing them with merchandise and trapper’s supplies. After the conclusion of each season, adjustment and settlement is made between the parties; the trapper is debited with the advances and is credited for the value of the skins “bought” by plaintiff.
In order to fully understand the origin of plaintiff’s claims, it is necessary to recite the transaction which'took place between Mirandona Brothers and Lorice Danos. Plaintiff’s bookkeeper, Cummings, related the nature of the advances made to Danos and the credits given for his catch of furs. Cummings produced and identified a statement prepared by him from plaintiff’s books, which sets forth the entries shown in defendant’s account. According tp the statement, defendant was charged with cash advances (on various mentioned dates), $1,050.00; twelve dozen traps, $120; payment of grocery bill, $183.58; trapper’s knife, $2; license, $2; total, $1,357.58. Defendant was credited with $597.08, representing his share of the skins bought by plaintiff, leaving a debit balance of $760.50, which is the amount sued for.
Defendant denied from the witness stand that any advances, either cash or otherwise, were made to him on account of the 1946-1947 season. However, he made no mention of the credits given him for skins. We are certain that defendant “worked” for Mirandona Brothers during the season in question and turned over to plaintiff the results of his labors, for we find in the record receipts issued to “L. & O. Danos” by plaintiff’s “pick up” man for skins received at the Danos camp on five different occasions.
The first note declared upon by plaintiff is for the sum of $150, and is dated September 3, 1946. The second note is for the sum of $450 and bears the date February 20, 1947. The notes are payable on demand to the order of “Mirandona Bros.,” with interest at six per cent per annum. They are signed,
“Lorice his X mark Danos.” mark The petition consists of four numbered paragraphs. Defendant in his answer categorically denied the allegations of each paragraph of the petition.
It is well settled in our .jurisprudence that the ordinary mark of a person incapable of writing, when established by legal evidence, is to be taken as his signature. Watts et al. v. Collier et al., 140 La. 99, 72 So. 822, on rehearing.
It will be noted that the'defendant did not expressly acknowledge or deny his “signature” as required by C.P. arts. 323 and 324 and R.C.C. art. 2244. A general denial is not sufficient to constitute a denial of signature. Breckenridge State Bank v. Nelson, 8 La.App. 792. Nor does the answer set forth the contention that there was a lack of consideration for the notes, which is also a special defense. Plaintiff’s counsel made no objection whatsoever to the attempt of defendant to disavow his mark, or to defendant’s contention that the notes lacked consideration. ■ There is considerable testimony pro and con on each of the two propositions, admitted without ob *161 jection, and, therefore, it must be deemed that the answer was enlarged by the evidence touching upon the two points in question.
Both Cummings, plaintiff’s bookkeeper, and A. Mirandona; one of its partners, testified that the advancements of cash as shown by the statement were made to Lori'ce Danos at the office of plaintiff, and that they saw him affix his mark to the notes, which were prepared by Cummings. The twelve dozen traps, as well as the license and .knife, were delivered to Danos, according to Cummings’ testimony.
Defendant’s counsel points to what he considers a discrepancy in the $150 transaction. The statement reflects that the $150 was advanced on “9/6/46”, while the note which purports to evidence it bears the date “9/3/46.” We consider the variance in dates of no particular moment, as the evidence is convincing that in consideration of the $150 the note was issued. If the note is incorrectly dated, such would not affect its validity.
Danos claims that he owes plaintiff nothing. His story is that he took enough provisions, purchased from another concern, to his camp before the trapping season opened, and that whatever cash money he needed wa9 advanced by his sister-in-law. He also maintained that on the particular dates borne by the notes he was on the trapping grounds. Danos offered in evidence five “tabs,” two of which respectively bear the same dates as the notes, given to him-by plaintiff’s pickup man for skins received on those dates. Danos’ contention is that these tabs established proof that he could not have been in New Orleans when the notes were supposed to have been executed. We notice that the tabs are made out in the name of “L. & O. Danos,” and nothing is shown thereon as to who delivered the skins to the pickup man. Whether Danos made delivery personally, a point on which the record is silent, is immaterial to a decision of the case, as the Danos camp is located but thirty-five miles' from New Orleans, and in these days of modern . transportation, we see no reason why Lorice Danos could not have come to New Orleans on the particular dates, even assuming that he personally delivered the skins to plaintiff’s employee. Defendant’s wife was equally emphatic that Danos was running traps on the particular dates and could not possibly have been in New Orleans. Her testimony is not at all impressive.
Defendant’s counsel calls attention to the fact that the marks on the notes are different in character, but the only difference we can discern in the two marks is that one is larger than the other, and we cannot say that they were not made by the same hand.
Danos testified that while he does not write he is able to make his signature. The argument proceeding from this is that if the defendant had executed the notes his name would have appeared instead of the “X” marks. There is no merit to this argument, as it is refuted absolutely by Danos’ own admission that he only learned to write his name a few months before the trial of the case.
Our firm opinion is that the two notes contain the mark of defendant and were executed iii.the presence of Cummings and A. Mirandona. The “signatures” on the notes have been proved satisfactorily by plaintiff in the manner and mode provided by C.P. art. 325.
Under the Negotiable Instruments Law, Act No. 64 of 1904, § 24, (now LSA-RS 7:24), every negotiable instrument is deemed prima facie to have been issued for a valuable consideration. The burden of proving want of a consideration rested with defendant. His evidence, which consists of the testimony of himself and his wife, is negative and insufficient to overcome the legal presumption that the notes were issued for a valuable consideration and the positive testimony of Cummings and A. Mirandona.
The 1946-1947 trapping season was a poor one for Danos. His testimony is that “marsh buggies” operated by various oil companies had been driven over the land on which he conducted the trapping operations, which had the effect of disturbing fur-bearing animals, and driving them away. There is not the slightest doubt that Danos' *162 did incur an account with plaintiff, the amount of which, because of the poor season, exceeded his credits. Danos pretended that he incurred no indebtedness. This cannot be so. Why would Danos have delivered his catch to Mirandona Brothers, without demanding compensation, if he was not indebted for advances? A. Mirandona explained that a few months before the trial he contacted Danos by telephone and endeavored to have him call at plaintiff’s office for the purpose of making an adjustment of the account, but that Danos peremptorily refused to discuss the matter.
Left for our consideration then is defendant’s liability for the amount claimed on the open account. As has already been said, the statement shows a debit balance of $760.50. Deducting therefrom the aggregate amount of the two notes, $600, the balance on the open account is $160.50. Plaintiff, however, has failed to prove that Danos owes this balance. On November 14, 1946, $10 cash was purportedly advanced to .Danos, and on March 1, 1947, plaintiff, for Danos’ account, paid $183.58 to DeFelice Grocery. Cummings, of his own knowledge, knew nothing of the $10 advance, and as to the $183.58 he testified that the amount was paid to the proprietor of the grocery store for Danos. However, there is nothing showing that Danos owed money to DeFelice or that he ever instructed Mir-andona Brothers to pay the bill. He emphatically denies that he bought anything from DeFelice’s store. In view of these circumstances, we do not think that the balance claimed on the open account has been proved, as the two items of $10 and $183.58 must be eliminated, the total thereof more than offsetting the amount of $160.50 which is claimed as the balance on the open account.
It is now ordered, adjudged, and decreed that the judgment appealed from be reversed, and that there now be judgment in favor of plaintiff and against defendant, Lorice Danos, for the full sum of $600, with six per cent per annum interest on the sum of $150 from September'3, 1946, until paid, and with six per cent per annum interest on the sum of $450 from February 20, 1947, until paid; that plaintiff’s claim for the sum of $160.50 on the open account be and the same is hereby dismissed as in the case of nonsuit. Defendant-appellee is to pay costs of both courts.
Reversed.