SAMUEL, Judge.
This is a suit for $3,100, being the alleged balance due on defendant’s promissory note dated August 15, 1957, for $3,275 to the order of plaintiff, together with interest and 20% attorney fees as stipulated in the note. The defense was a plea of absence of consideration. Plaintiff appeals from a judgment in favor of defendant and dismissing the suit.
Plaintiff was the owner of a restaurant in which the defendant, the sole proprietor of a pinball machine business operating under the trade name of C and M Specialty Co., had some of his machines. Plaintiff wanted to sell his business for $9,000 cash and had talked about the matter with one Verbon Gay, an insurance broker. Gay contacted two interested persons, Dalton and Acosta, and introduced them to plaintiff. There was some delay in consummating the sale while the purchasers waited to do business with their own pinball machine operator and plaintiff brought in the defendant, who was desirous of keeping his machines in the restaurant. On August 9, 1957, plaintiff sold his business to Dalton and Acosta for $9,000. As part of the ptxrchase price the new owners executed their promissory note dated August 9, 1957, for $4,500, to the order of the aforesaid C and M Specialty Co., which note was received by defendant and thereafter remained, unendorsed, in his possession. The day the sale took place defendant gave to plaintiff a check for $4,500, which check was payable to the order of plaintiff, drawn on the account of C and M Specialty Co., and signed for that company by the defendant. After the passage of the sale plaintiff endorsed this check in blank and returned it to the defendant who deposited the check to his company’s account on August 12, 1957. On or about said date of August 12, 1957 (as reflected by the testimony hereinafter set forth, the exact date is in conflict), defendant gave plaintiff the note in suit, which note is dated August 15, 1957, and is in the amount of $3,275. On December 12, 1957, defendant paid plaintiff $175 which the former credited to the note in suit thus leaving the balance of $3,100 for which this suit has been brought.
*308 Prior to and at the time of these transactions plaintiff was indebted to the defendant in the amount of $1,225, the balance due on an original indebtedness of $1,500 arising out of two advances by defendant to plaintiff, one of $1,000 when the latter went into the business and $500 thereafter for federal licenses due on the pinball machines.
The record reveals that pinball machine, operators customarily advance money to persons going into a business in which the machines can be used in order to have what they refer to as a “location”, a place in which to put and operate the machines, the money so advanced usually being paid back out of the proceeds of such machines.
Dalton and Acosta had operated the business for only a short time when they sold the same to a third person or persons a_,d the litigants discussed between themselves the best method of collecting the $4,500 note. Dalton and Acosta later went into bankruptcy.
Only four witnesses testified. The plaintiff called one witness, Gay, in addition to himself, and the defendant called one witness, his attorney, in addition to himself. Neither of the purchasers of the restaurant, Dalton and Acosta, was called as a witness and the record reflects that these men had no knowledge of the details of the transaction between the litigants.
The plaintiff testified that he had endorsed and returned to defendant the latter’s $4,500 check on the same day he received the note in suit, which note had been dated August 15, 1957, (several days after the check was returned) by defendant so that the date would be “even”. The amount of the note, $3,275, represented the difference between the $4,500 check given by defendant to plaintiff and plaintiff’s indebtedness of $1,225 to the defendant. The note executed by Dalton and Acosta was the defendant’s property at all times and plaintiff understood that defendant had made the usual arrangements to collect this note out of the proceeds of his machine. However, plaintiff admitted on cross examination that, after their conversation relative to the best means of collecting, he and the defendant went to the latter’s lawyer and' plaintiff asked the lawyer to collect the note for his (plaintiff’s) account. At that time it was explained to the lawyer that plaintiff was the owner of the Dalton-Acosta note and that plaintiff had requested the defendant to hold and collect the note for him out of the proceeds of the pinball machines. Plaintiff’s explanation of this action and conversation was that it had been done only at the request of the defendant and with the thought on plaintiff’s part that the sooner the defendant got his money the quicker plaintiff would receive his. He further testified that he had been making $70, $80 or even $90 per week out of the machines so that the note could be paid out of these proceeds within a period of about a year and that Ajax, another coin company, had loaned $3,000 to the persons who purchased the business from Dalton and Acosta.
Verbon Gay, plaintiff’s witness, testified that he was present during a conversation between Dalton and the defendant and had heard the defendant, who appeared to be anxious to keep his machines in the restaurant, offer to contribute to the financing of the purchase by Dalton and Acosta. This witness further testified that plaintiff had brought the defendant into the picture under the impression that the latter would finance part of the purchase price if allowed to keep his machine in the restaurant.
Philips testified that he did not owe plaintiff any money whatsoever, there being no need for him to incur such an indebtedness because he was a man of considerable means (he mentions owning $250,000 in New Orleans real estate in addition to several businesses) and that in any event he would not have advanced as much as one-half of the purchase price. He explained his $4,500 check and his note for $3,275, both payable to the plaintiff, as follows: Giannopulos had been in business for a little more than eleven months when he informed the defendant “Philips, I am going to have to sell *309 the place. Would you give me a check over the counter for the sale, and then collect your money from the earnings of the machines, and then after you collect your money, then pay me the difference?”; concerning the note he testified that he gave the same to the plaintiff, at the latter’s request and only as a protection to the latter’s wife in the event of plaintiff’s death, some three weeks after the sale of the business to Dalton and Acosta (we notice that the sale was on August 9, 1957, and the note is dated August 15, 1957). He further testified that he had given plaintiff $175, which the latter had credited against the note in suit, as a further loan at the request of plaintiff who had said he needed $150 to buy a Christmas present for his wife.
Philips’ only other witness, his attorney, confirmed defendant’s testimony and plaintiff’s admission to the effect that the litigants had to come to his office and had asked him to collect the $4,500 note for the plaintiff. The attorney testified that defendant had given him this information and plaintiff had agreed to its correctness.
It is the contention of the plaintiff that the defendant gave financial assistance to Dalton and Acosta, the purchasers, by advancing to them the sum of $4,500 on the purchase price, in effect buying the note of the purchasers in that amount, and that the note in suit was in settlement of the mutual claims the litigants had one against the other, the face value of this note, $3,275, being the difference between the $4,500 participation by defendant in the sale and the $1,225 prior indebtedness due by plaintiff to the defendant.
It is the contention of the defendant that he did not assist Dalton and Acosta in the financing of their purchase from Gian-nopulos, that the Dalton-Acosta note actually belonged to plaintiff, and that his $4,500 check and $3,275 note were given only as a convenience and accommodation to Giannopulos at the latter’s request and without any consideration.
The law is quite clear that absence of consideration is a defense available to Philips in the instant case.
LSA-R.S. 7:24 provides:
“Every negotiable instrument is deemed prima facie to have been issued for a valuable consideration; and every person whose signature appears thereon to have become a party thereto for value.”
LSA-R.S. 7:28 provides:
“Absence or failure of consideration is a matter of defence as against any person not a holder in due course; and partial failure of consideration is a de-fence pro tanto, whether the failure is an ascertained and liquidated amount or otherwise.”
The vast majority of jurisdictions in the United States place upon the defendant the ultimate burden of proving an absence of consideration by a preponderance of the evidence. 17 La.L.Rev. 477. However, despite expressions to the contrary in some Louisiana cases (see Quaintance v. Cook, La.App., 92 So.2d 504; Mirandona Bros. v. Danos, La.App., 56 So.2d 159), this state follows the minority view. Where absence of consideration is properly pleaded and supported by evidence sufficient to overcome the prima facie presumption of the presence of consideration, the ultimate burden of proving consideration, by evidence that preponderates, is on the plaintiff. 17 La.L.Rev. 479; Trailer Enterprises, Inc. v. Eikenbary, La.App., 122 So.2d 655; Cooper v. Succession of Cooper, 234 La. 832, 101 So.2d 686; Moss v. Robinson, 216 La. 295, 43 So.2d 613.
In the instant case it is unnecessary for us to determine whether or not the defendant has offered sufficient evidence to overcome the prima facie presumption. For a careful study of all the evidence convinces us that, even if the ultimate burden of proving consideration is upon the plaintiff, he *310 has successfully carried that burden and is entitled to a judgment.
What strikes us most forceably is that in the light of everyday business experience and common sense the plaintiff's position is reasonable and probable while the defendant’s position is extremely unlikely. In view of the established facts to the effect that it was a usual practice for the operator of the pinball machines to assist in financing the purchasers of a business in order to obtain a “location”, that the defendant was interested in obtaining the “location” involved here, and that he offered to contribute to the financing of the purchase by Dalton and Acosta, who already had another pinball machine operator interested, it was a natural and normal business transaction for the defendant to loan $4,500 to Dalton and Acosta by accepting their note in that amount and by giving to plaintiff his check in the same amount, thus in effect buying the Dalton and Acosta note. The next transaction was also natural and normal. In exchange for his check for $4,500 defendant gave to plaintiff his note for $3,275, representing the difference between the amount of the check and the $1,225 indebtedness due by plaintiff to him. This cleared up all prior transactions between the litigants enabling the defendant to retain his “location” with a favorable opportunity to collect payment of the Dalton-Acosta note out of the pinball machine proceeds, and gave to plaintiff, not the full amount of the purchase price in cash as he originally desired, but half of that amount in cash with the other half in the form of a promissory note he had every reason to believe was sound and secure.
On the other hand, if defendant’s position is correct, plaintiff has concluded the sale of his business with only two things to show therefor, the note in suit, uncollectable under the defendant’s contention, and one-half of the sale price of $9,000. To all practical intents and purposes the Dalton-Acosta note is beyond his reach. That note, unendorsed, is in the possession of the defendant whose company is the sole payee thereon. Except for the insolvency of Dalton and Acosta and the present defense of absence of consideration, plaintiff conceivably could not have obtained or collected the Dalton-Acosta note without a complicated law suit or suits the success of which would be far from assured.
Other than the completely unsupported testimony of the defendant the only evidence in the record which mitigates against the plaintiff’s case is plaintiff’s admission, and the proof to the same effect, that plaintiff had agreed to the correctness of the information given by defendant to the latter’s attorney that the Dalton-Acosta note belonged to plaintiff and had requested that the attorney collect the same for plaintiff’s account. Plaintiff’s explanation of his conduct, that it was done at the request of the defendant and with the thought that the sooner the defendant received payment of the Dalton-Acosta note the sooner he would pay the note in suit, is indeed weak and inconsistent with the plaintiff’s position.
But there are greater weaknesses and inconsistencies in the defendant’s testimony even to the extent that his explanation of the whole transaction approaches the unbelievable. According to him he gave the $4,500 check to Giannopulos for no reason except that the latter requested it. Other than the implication that as operator of the machines he was in a better position to collect the note, he does not explain at all why the Dalton-Acosta note was made payable to his (defendant’s) company. His explanation of why he gave plaintiff the note in suit, completely unsatisfactory and apparently forced, is as follows:
“Q. Now, when Mr. Giannopulos came in to see you a few days later, what was his and your discussion with reference to the money? A. About three weeks after he came in, and he said, ‘Well Louis, you know,’ he said, ‘we are not all supernatural.’ He said, ‘You know, I have got to protect my wife,’ and he said, T would like for *311 you to give me a note for that money so that if anything would happen to me that my wife would be protected.’ I said, ‘Mr. Giannopulos, I don’t see why you want me to do that. I don’t think that would do any good anyway. I don’t think it would be any good.’ He said, ‘It’s only in case of my death— in case something would happen to me. I think that that would be a good idea to have a note.’ I told him, ‘I’m sorry you feel that way, Mr. Giannopulos.’ I said, ‘I thought you trusted me better than that.’ I guess I must have hurt him by that, because he walked out of the place then.”
The implication here, not mentioned by defendant in his testimony but suggested by his counsel on cross-examination of plaintiff, is that this note was given solely for the purpose of enabling plaintiff to prove there was an agreement between the litigants as to the collection of the Acosta-Dalton note. The implication is untenable. We believe the note in suit accurately and correctly reflects defendant’s indebtedness to plaintiff.
Nor are we impressed by defendant’s testimony to the effect that he would not have advanced to Dalton and Acosta as much as one-half of the purchase price of plaintiff's business or that, because of his means, there was no reason for him to become indebted to plaintiff. The amount of the prospective income from the machines and the uncontradicted testimony to the effect that another pinball machine operator loaned $3,000 to the purchasers of the business from Dalton and Acosta, together with the fact that the defendant did not advance the full amount of $4,500 but actually advanced $3,275 and simply changed debtors to the extent of $1,225 is sufficient to overcome the first. And it is not unusual for a business man to borrow money in connection with the operation of his business, his financial standing frequently having little or nothing to do with the ready cash he may have on hand.
The return of defendant’s $4,500 check and the receipt by defendant of the Dalton-Acosta note constitute ample consideration for the note in suit.
For the reasons assigned the judgment appealed from is annulled and reversed, and it is now ordered that there be judgment in favor of plaintiff and against the defendant in the full sum of $3,100 together with 6% per annum interest thereon from August 14, 1958, until paid, and 20% on said principal amount and interest as attorney’s fees, all costs to be paid by the defendant.
Reversed and rendered.